**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| SEDIGHEH ZOLFAGHARI,       ) | |
|                          ) | |
|       Plaintiff,          ) | |
|                          ) | |
| v.                         ) | Civ. Case No. _____ |
|                          ) | |
| UNITED STATES ARMY     ) | |
| CORPS OF ENGINEERS;     ) | |
| LEIUTENANT GENERAL    ) | |
| WILLIAM H. GRAHAM JR., in  ) | **COMPLAINT** |
| his official capacity as commander ) | |
| and Chief of the Engineers of the  ) | |
| Corps; and ALISA ZARBO, in her ) | |
| official capacity as Chief Engineer ) | |
| of the Palm Beach Section of the  ) | |
| Corps,                    ) | |
|                          ) | |
|       Defendants.       ) | |

_____

## INTRODUCTION

Sedigheh Zolfaghari grew up spending her summers on the farm. While her father worked as a pharmacist in the city, he still helped out on the old family farm whenever he could, and Sedigheh has always fondly remembered her time riding and caring for the horses. It was an idyllic—if far from luxurious—environment in which to grow up, and she has dreamed of recreating it ever since.

Sedigheh followed in her father's footsteps and, after moving to the United States with nothing but a backpack, began her career as a pediatrician. Dr. Zolfaghari established a successful practice in New Jersey and raised two wonderful children. Eventually, however, she grew tired of city life and the cold Northeastern winters, and decided to relocate to sunny Florida. She found the perfect piece of property in Lake Worth, the middle of the State's horse country, intending to spend her well-earned retirement raising horses and spending time with her family. To that end, she wants to construct a small stable and pasture on the property, just as authorized under the property's Agricultural-Rural zoning designation, *see* Palm Beach County Zoning Ordinance 2005-002, Ex. O (2005).

The government is currently prohibiting her from doing so unless she obtains a permit from the United States Army Corps of Engineers ("the Corps") under Section 404 of the Clean Water Act ("CWA"), claiming that her property contains federally protected wetlands. The Corps is also threatening her with litigation and more than $64,000 in fines for purported violations of an earlier permit she received to construct a guest house on the property. Notice of Noncompliance (May 23, 2024) (*Ex.* 1). Dr. Zolfaghari's property, however, does not contain any federally protected wetlands; with the Corps itself acknowledging that "it appears that these wetlands may no longer

fall under jurisdiction according to the current definition of [waters of the United States]." Email from Jonathan Pempek to Sedigheh Zolfaghari (May 29, 2024) (*Ex.* 2). The Supreme Court has limited the Corps' jurisdiction under the CWA to traditional navigable waters of the United States and those adjacent wetlands with a "continuous surface connection" to such waters, such as to be virtually indistinguishable from them. *See Sackett v. EPA*, 598 U.S. 651, 671 (2023). If a wetland does not satisfy these conditions, it is, as a matter of law, not among the regulable "navigable waters" and outside the jurisdiction of the CWA.

Despite the Corps publicly acknowledging these limits to its jurisdiction and announcing its intention to conduct a rulemaking to bring its regulations in conformity with the *Sackett* decision, it continues to enforce CWA compliance on property that lies outside its jurisdiction. Since the Corps forced many owners of non-jurisdictional property to comply with inapplicable CWA permitting requirements under threat of civil and criminal penalties prior to *Sackett*, the Corps now asserts that those owners have voluntarily contracted away their right to use their property as they see fit. As the Corps told Dr. Zolfaghari, it was going to enforce the terms of the permit "[r]egardless of [the land's] jurisdictional status." NWP Verification Letter (Feb. 21, 2025) (*Ex.* 3). In other words, the Corps demands that Americans comply with its demands—even if those demands were and are illegal—forever, or face prison time or punishing fines of tens of thousands of dollars a day.

Years ago, the Corps saddled Dr. Zolfaghari with onerous and costly environmental mitigation mandates as conditions for the granting of residential building permits over which the Corps had no lawful authority, yet claimed purported authority. Originally, the Corps justified these mandates by asserting that her property in Florida contained jurisdictional wetlands protected by

the CWA, but the Corps today admits the property never contained jurisdictional wetlands. Essentially, the Corps admits it has no constitutional or statutory authority to interfere with Dr. Zolfaghari's plans for her property, but it continues to demand she heed its authority anyway.

According to the Corps, since Dr. Zolfaghari signed building permits containing mitigation requirements two decades ago, she is bound by those permits in perpetuity, regardless of the underlying illegality of those permits. The Corps essentially extracted material concessions from Dr. Zolfaghari on false pretenses and under threat of onerous fines and prison. Now, the Corps hides behind that decades-old agreement even though the Supreme Court of the United States held in *Sackett* that properties like Dr. Zolfaghari do not contain jurisdictional wetlands. The Corps' continuing enforcement of its requirements contravenes *Sackett*. If the earlier permits were ever enforceable, they certainly are no longer enforceable after *Sackett*. This Court must hold unlawful and set aside the Corps' continued illegal regulation of private property that is patently beyond the Corps' jurisdiction to regulate.

## JURISDICTION AND VENUE

1.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).

2.     This Court has the authority to provide the relief requested against the Defendants under the Fifth Amendment's Due Process Clause, 28 U.S.C. §§ 2201 (Declaratory Judgment Act) and 2412 (Equal Access to Justice Act), 5 U.S.C. § 702 (the Administrative Procedure Act), and 42 U.S.C. § 1988 (relief for violation of civil rights).

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred, and the property that is the subject of this action is located within, this judicial district.

## PARTIES

4.      Plaintiff Sedigheh Zolfaghari owns a home in Lake Worth, Florida, where she has lived for more than 20 years.

5.      Defendant Corps is a branch of the United States Army charged with, *inter alia*, issuing permits for the discharge of dredged and fill material into waters of the United States and adjacent wetlands.

6.      The Corps is the U.S. government agency responsible for issuing and enforcing the permits challenged in this action.

7.      Defendant Lieutenant General William H. Graham Jr. is the Commander and Chief of Engineers of the Corps.

8.      In his capacity as Commander and Chief of Engineers of the Corps, Defendant Graham is charged with enforcing Section 404 of the Clean Water Act, including the issuing of permits authorizing the discharge of dredged and fill material, as well as overseeing the promulgation of rules and regulations interpreting the Corps' authority under the statute.

9.      Defendant Graham is sued in his official capacity.

10.     Defendant Alisa Zarbo is the Chief Engineer of the Palm Beach Gardens Section of the Corps.

11.     In her capacity as Chief Engineer, Defendant Zarbo oversees the review and issuance of Corps permits for the Palm Beach Gardens Section in southern Florida.

12.     Defendant Zarbo refuses to conduct a jurisdictional determination and asserts that Dr. Zolfaghari was required to comply with the terms of her permits "regardless" of whether her property was jurisdictional or not. *Ex.* 3.

13.     Defendant Zarbo is sued in her official capacity.

## LEGAL BACKGROUND

14.     Congress enacted the CWA in 1972 to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).

15.     The CWA prohibits "the discharge of any pollutant" into "navigable waters," 33 U.S.C. §§ 1311(a), 1362(12)(A), and jointly empowers the Environmental Protection Agency ("EPA") and the Corps with its enforcement. *See* 33 U.S.C. §§ 1319(a), 1344(a).

16.     The text of the CWA facially applies only to the "navigable waters" of the United States, defined as "the waters of the United States, including the territorial seas." 33 U.S.C. §§ 1251(a), 1362(7).

17.     The precise definition of "waters of the United States" has been the subject of considerable controversy in the decades since the CWA's enactment. *See Sackett*, 598 U.S. at 663.

18.     At first, the Corps kept to its traditional role of ensuring the navigability of America's interstate shipping lanes, asserting jurisdiction over only those navigable waters "capab[le] of use by the public for purposes of transportation or commerce." 33 C.F.R. § 209.260(e)(1) (1975).

19.     The Corps' interpretation of its own authority under the CWA gradually expanded over the years, culminating in a 2008 rulemaking asserting authority over "[a]ll . . . waters" that "could affect interstate or foreign commerce," including "intrastate lakes, rivers streams (including

intermittent streams), mudflats, sandflats, wetlands, sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds." 40 C.F.R. § 230.3(s)(3) (2008).

20.     Further, the Corps expanded its authority over "adjacent" wetlands—any wetland areas (also broadly defined) that happen to be "bordering, contiguous, or neighboring" a covered water, including those wetlands that are physically separated from covered waters by natural or man-made barriers. 40 C.F.R. §§ 230.3(b), 230.3(s)(7).

21.     The U.S. Supreme Court, while inclined at the time to defer to the agencies' interpretations, repeatedly expressed concern over the EPA and Corps' arrogation of power to themselves, attempting to cabin the worst excesses. *See United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 132–33, 135 (1985) (expressing concern over the Corps' expansive interpretation of the CWA, but nevertheless deferring to the agency on where to draw the line); *Solid Waste Agency of N. Cook Cnty. v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 168 (2001) (rejecting the migratory bird rule, which extended jurisdiction to any waters or wetlands that "are or would be used as habitat" by migratory birds or endangered species, holding that CWA jurisdiction does not extend "to ponds that are not adjacent to open water").

22.     The Corps and the EPA continued to seek opportunities to expand their CWA jurisdiction, largely through the increase in individualized determinations and promulgation of vague regulations, *see Sackett*, 598 U.S. at 667, eventually requiring the Supreme Court to step in again to rein the agencies in.

23.     In *Rapanos v. United States*, 547 U.S. 715 (2006), the Court reversed a lower court decision holding that the CWA covered wetlands near ditches and drains that eventually emptied into navigable waters at least 11 miles away, but no opinion was able to win a Court majority.

24.     Following *Rapanos*, the EPA and the Corps "issued guidance documents that 'recognized larger grey areas and called for more fact-intensive individualized determinations in those grey areas.'" *Sackett*, 598 U.S. at 667 (quoting N. Parrillo, *Federal Agency Guidance and the Power To Bind: An Empirical Study of Agencies and Industries*, 36 Yale J. on Reg. 165, 231 (2019)), culminating in a situation where the Corps was asserting that "almost all waters and wetlands across the country theoretically could be subject to a case-specific jurisdictional determination." 80 Fed. Reg. 37054, 37056 (June 29, 2015).

25.     This controversy over the extent of the agencies' jurisdiction under the CWA came to a head in *Sackett*. The Sacketts had purchased a piece of property in Idaho to build a home, which required backfill of dirt and rocks. The EPA then came in and asserted the property was a jurisdictional wetland and threatened the Sacketts with thousands of dollars of daily fines if they did not restore the site to its previous state. Only, the Sacketts' property did not include any waters of the United States, being located across a 30-foot highway from "an unnamed tributary," which feeds into a non-navigable creek, which feeds into a navigable lake. *Sackett*, 598 U.S. at 662–63.

26.     The Supreme Court refused to accept the EPA's (and by extension, the Corps') broad interpretation of EPA jurisdiction, and reaffirmed that the government's authority to regulate land under the CWA is limited to actual waters as traditionally conceived (i.e., oceans, lakes, rivers, and streams) and those wetlands with a "continuous surface connection" to actual waters, such that the wetland is "indistinguishably part of a body of water that itself constitutes 'waters' under the CWA." *Sackett*, 598 U.S. at 676–78. The CWA does not extend—and has never extended—to wetlands that lack a continuous surface connection to waters of the United States.

–8–

27.     Under its CWA Section 404 authority, the Corps issues a series of Nationwide Permits ("NWPs") every 5 years (after which each NWP expires and must be amended or reissued). Each NWP provides a broad authorization for a certain category of CWA-regulated activity, setting basic contours within which regional and individualized permit decisions can be made. For example, NWP 29, reissued in 2021, applies to residential developments and authorizes the discharge of dredged or fill material "for the construction or expansion of a single residence, a multiple unit residential development, or a residential subdivision," while requiring individual permittees to "submit a pre-construction notification to the district engineer prior to commencing the activity." 86 Fed. Reg. 2744, 2861 (Jan. 13, 2021).

## FACTUAL ALLEGATIONS

28.     Sedigheh Zolfaghari is a (now retired) physician of more than 25 years.

29.     After completing her medical studies in her home country of Iran, she fled to the freedom and security of the United States shortly before the Ayatollah's revolution.

30.     In America, Dr. Zolfaghari raised two wonderful children and enjoyed a long and successful career as a pediatrician.

31.     Upon her retirement, Dr. Zolfaghari purchased a picturesque piece of property in Lake Worth, Florida, in 2002, where she has happily lived for more than 20 years.

32.     The property she purchased is located at 5862 Homeland Road, Lake Worth, Florida 33449.

33.    The property is roughly triangular in shape, with Homeland Road along its western boundary, a neighboring residential property along its southern boundary, and a canal along its eastern boundary, as shown in this satellite imagery obtained from Google Maps:



34.    The interior of the property includes some areas of marshy soil that can be described as wet, but these areas of the property are separated from the canal by at least 30 feet of dry land with no continuous surface connection to the canal or any other body of water that could be construed as a water of the United States.

35.    In March 2000, the Corps conducted a jurisdictional determination at the request of the property's previous owner and determined that "the majority of the lot" included jurisdictional wetlands. Jurisdictional Determination (Mar. 23, 2000) (*Ex.* 4).

36.    In January 2009, the Corps described the purported wetlands on the property as "adjacent [to a] non-relatively permanent waterbody," Guest House Permit at 3 (Jan. 6, 2009) (*Ex.* 5), a basis for CWA jurisdiction that the Supreme Court and the Corps itself have explicitly

rejected. *See Sackett*, 598 U.S. at 671 ("[T]he CWA's use of 'waters' encompasses 'only those relatively permanent . . . bodies of water . . . that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'") (quoting *Rapanos*, 547 U.S. at 739); 88 Fed. Reg. 61964, 61965 (Sept. 8, 2023).

37.     Dr. Zolfaghari was informed when purchasing the property that it included jurisdictional wetlands.

38.     The property came with a pre-existing transferable Corps permit authorizing the construction of a single-family home and stating the planned construction complied with the terms of NWP 26. Original Army Corps Permit (*Ex.* 6).

39.     NWP 26 expired in 2000 and was replaced, in relevant part, by NWP 29. NWP 29 was reissued in 2007, 2012, 2017, and 2021, and is the NWP that would apply to Dr. Zolfaghari's property—if it included jurisdictional wetlands.

40.     The Corps' building permit asserted that nearly the entirety of Dr. Zolfaghari's property was made up of jurisdictional wetlands.

41.     In 2003, Dr. Zolfaghari received a construction permit from the Palm Beach County Planning, Zoning & Building Department to build her home on the property.

42.     Dr. Zolfaghari built the home in accordance with the permit terms—recognizing she had no choice in the matter because otherwise the Corps could imprison and fine her, *see* 33 C.F.R. §§ 326.5 (describing availability of judicial action against violators of Section 404); 326.6 (describing availability of administrative penalties under Section 404), and lived on the property for several years without any further interactions with the Corps.

43.     In 2008, Dr. Zolfaghari wished to build a guest house on the property for her son to live in, and—recognizing the risk of fines or prison if she built without the supposedly-required permission of the Corps—she sought a new permit from the Corps to impact another half-acre of purported wetlands.

44.     The Corps approved construction of the guest house but conditioned its approval on Dr. Zolfaghari agreeing to engage in certain mitigation activities, including maintaining two acres of purported wetland in its natural state in perpetuity. *Ex.* 5, at 2–3.

45.     Dr. Zolfaghari constructed the guest house in compliance with the Corps' permit terms.

46.     In 2024, Dr. Zolfaghari wished to build a stable on the property to raise horses, an authorized use under the property's Agricultural-Rural zoning designation, *see* Palm Beach County Zoning Ordinance 2005-002, Ex. O (2005), and sought permission from the Corps to do so.

47.     While conducting an inspection of the property related to this request on April 3, 2024, the Corps claims to have identified a violation of Dr. Zolfaghari's mitigation obligations under Special Permit Condition 3 of the 2008 permit.

48.     In a May 23, 2024, letter, the Corps accused Dr. Zolfaghari of placing fill material in "jurisdictional wetlands" required to be maintained in their natural state in perpetuity by the permit, and threatened her with litigation and more than $64,000 in fines unless she comes into compliance with their demands.

49.     After learning of the Supreme Court's decision in *Sackett*, Dr. Zolfaghari recognized that according to the decision none of the purported wetlands on her property satisfied the Court's test for determining the appropriate scope of CWA jurisdiction.

–12–

50.     Simply put, no continuous surface connection to any body of water that could be plausibly described as a water of the United States exists that extends the Corps' jurisdiction over the canal to Dr. Zolfaghari's non-jurisdictional property.

51.     Throughout the summer of 2024, Dr. Zolfaghari attempted to raise her concerns about the non-applicability of the CWA to her property with local Corps officials.

52.     In an email dated May 29, 2024, Corps compliance and enforcement officer Jonathan Pempek told Dr. Zolfaghari that "it appears that these wetlands may no longer fall under jurisdiction according to the current definition of [waters of the United States]." *Ex.* 2.

53.     On May 31, 2024, Dr. Zolfaghari sought a reverification of the jurisdictional status of her property from the Corps, considering the Supreme Court's explication of the law in *Sackett*. Request for Corps Jurisdictional Determination (May 31, 2024) (*Ex.* 7).

54.     In an email dated July 22, 2024, Kyle Nichols, a Senior Project Manager at the Corps' Regulatory Division in Miami, informed Dr. Zolfaghari that a site visit had been conducted "which appears to be sufficient to make our determination" regarding her request for a jurisdictional determination. The email states that a jurisdictional determination would be completed, posted online, and sent to Dr. Zolfaghari.

55.     On information and belief, no jurisdictional determination has been published, either online or to Dr. Zolfaghari directly.

56.     On February 21, 2025, Dr. Zolfaghari received a letter from Alisa Zarbo, Chief of the Corps' Palm Beach Gardens Section. *Ex.* 3.

57.     The Corps refused to provide a jurisdictional determination for the property, asserting Dr. Zolfaghari's permit gave it all the authority it needed, "[r]egardless of [the land's] jurisdictional status." *Ex. 3.*

58.     The Corps told Dr. Zolfaghari that it may consider *modifying* the terms of her permit, should she apply for it, but that any modification would still require a mitigation plan to offset the impacts of construction. In other words, the Corps not only illegally asserts authority over her property, it asserts that the permits it issued are contracts that are perpetual and last forever.

59.     Dr. Zolfaghari now brings this action seeking a declaration that the permit conditions requiring CWA mitigation and compliance with Nationwide Permit 26 are null and void *ab initio* as an ultra vires abuse of the Corps' statutory authority, an injunction prohibiting the Corps from attempting to regulate Dr. Zolfaghari's non-jurisdictional property going forward, and nominal damages for the violation of Dr. Zolfaghari's Fifth Amendment rights under *Bivens v. Six Unknown Named Agents of Fed. Bureaus of Narcotics*, 403 U.S. 388 (1971).

60.     Alternatively, if they were not void *ab initio*, the Court should declare them no longer enforceable since they are premised on the Corps' continued illegal assertion of jurisdiction—post *Sackett*—over Dr. Zolfaghari's property.

### CLAIMS FOR RELIEF

### Count I

***The Corps' Assertion of Jurisdiction is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law***

### (APA, 5 U.S.C. § 706(2)(A))

61.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

62.     The Administrative Procedure Act ("APA") requires this Court to hold unlawful and set aside any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

63.     The CWA prohibits the discharge of pollutants into the "navigable waters" or "waters of the United States," and jointly charges the Corps and the EPA with the statute's enforcement.

64.     "[T]he CWA's use of 'waters' encompasses 'only those relatively permanent, standing or continuously flowing bodies of water "'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes.'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739).

65.     While Congress has amended the CWA to extend to "wetlands adjacent" to waters of the United States, wetlands are not, themselves, waters of the United States, and this expansion of jurisdiction was strictly limited to "adjacent" wetlands. *See* 33 U.S.C. § 1344(g)(1).

66.     In *Sackett*, the Supreme Court made it clear that agencies may only regulate (1) "those relatively permanent, standing or continuously flowing bodies of water 'forming geographic[al] features' that are described in ordinary parlance as 'streams, oceans, rivers, and lakes,'" *Sackett*, 598 U.S. at 671 (quoting *Rapanos*, 547 U.S. at 739 (plurality opinion)); and (2) "wetlands" (i) with a "continuous surface connection" to such waters (ii) that are "'as a practical matter indistinguishable from waters of the United States,' such that it is 'difficult to determine where the "water" ends and the "wetland" begins,'" *id.* at 678 (quoting *Rapanos*, 547 U.S. at 742 (plurality opinion)). If a wetland does not satisfy these conditions, it is, as a matter of law, not among the regulable "waters of the United States."

67.     Supreme Court decisions applying a rule of federal law must be given full retroactive effect, "regardless of whether such events predate or postdate [the Supreme Court's] announcement of the rule." *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993).

68.     Any purported wetlands on Dr. Zolfaghari's property lack a continuous surface connection to a body of water that can be described as a water of the United States in its own right.

69.     In asserting authority over non-jurisdictional private property "regardless" of whether the CWA applies, prohibiting Dr. Zolfaghari full use and enjoyment of that same property, and continuing to hold Dr. Zolfaghari responsible for rewilding and other environmental mitigation activities on the property, the Corps is acting in direct contravention of the Supreme Court's command in *Sackett* to cease attempting to regulate wetlands that lack a continuous surface connection to a water of the United States.

70.     By these acts or omissions, the Corps violated the APA, 5 U.S.C. § 706(2)(A). The permits at issue in this case are therefore invalid and must be set aside.

## Count II

### *The Corps' Assertion of Jurisdiction is in excess of statutory jurisdiction, authority, or limitations, or short of statutory right*

### (APA, 5 U.S.C. § 706(2)(C))

71.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

72.     The APA requires this Court to hold unlawful and set aside any agency action that exceeds the agency's statutory authority. 5 U.S.C. § 706(2)(C).

73.     For the reasons articulated above at Paragraphs 63–69, the Corps' assertion of authority to regulate Plaintiff's property regardless of its jurisdictional status under the CWA directly contravenes *Sackett*'s test for federal wetlands authority, and as a result the CWA's limited

–16–

grant of jurisdiction for the Corps to regulate "navigable waters," defined as "the waters of the United States." 33 U.S.C. § 1362(7).

74.     Further, when an agency claims broad authority to exercise powers of "vast economic and political significance," it "must point to 'clear congressional authorization' for the power it claims." *West Virginia v. EPA*, 597 U.S. 697, 716, 723 (2022) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)).

75.     In *Sackett*, the Supreme Court recognized that tens of millions of non-adjacent lands the Corps claimed authority over were outside the jurisdiction conferred by Section 404 of the CWA, a reduction of up to 84%. *See* National Resources Defense Council, Report, *Mapping Destruction: Using GIS Modeling to Show the Disastrous Impacts of* Sackett v. EPA *on America's Wetlands* 6, 13 (Mar. 2025), https://www.nrdc.org/sites/default/files/2025-03/Wetlands_Report_R_25-03-B_05_locked.pdf (analyzing data from the United States Geological Survey and the United States Fish and Wildlife Service's Wetland Inventory Map).

76.     A substantial proportion of Section 404 permits issued prior to 2023 likely do not encompass jurisdictional wetlands.

77.     The Corps' assertion of "highly consequential power," *Georgia v. President of the United States*, 46 F.4th 1283, 1296 (11th Cir. 2022), to continue enforcement over lands outside its jurisdiction and attempted end-run around the Supreme Court's decision in *Sackett* is thus an extraordinary attempt to unilaterally expand the scope of its authority in the face of explicit rebuke from the Supreme Court.

78.     The Corps' assertion of authority here therefore concerns an issue of vast economic and political significance.

79.     That assertion of authority also requires a clear statement from Congress because it would "significantly alter the balance between federal and state power and the power of the Government over private property." *Sackett*, 598 U.S. at 679. By continuing to enforce the CWA where it has no jurisdiction over private property, the Corps is undermining the "core of traditional state authority" to regulate land and water use. *Id.* at 680.

80.     If accepted, the Corps' view of its power will also have the widespread consequence of forcing any landowners victimized by the pre-*Sackett* regulatory regime to continue abiding by the costly impacts of illegal permits under the threat of severe civil and criminal liability for normal use of their property. To assert that authority would also require a clear statement from Congress. *Id.* at 680–81.

81.     The Corps cannot identify a clear statement authorizing it to exercise this sweeping power. Indeed, there is nothing in the statute authorizing the continued enforcement over non-jurisdictional wetlands under the CWA. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it.").

82.     By these acts or omissions, the Corps violated the APA, 5 U.S.C. § 706(2)(C). The permits at issue are invalid and must be set aside.

**Count III**

***The Permits place unconstitutional conditions on the use of Plaintiff's property***

**(5th Amendment)**

83.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

84.     The Fifth Amendment to the United States Constitution prohibits the government from taking private property for public use without just compensation. U.S. Const. amend. V.

85.     Courts have long recognized takings may take forms other than direct appropriations of property. *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014 (1992) ("[W]hile property may be regulated to a certain extent, if the regulation goes too far it will be recognized as a taking.") (quoting *Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)). These types of takings are referred to as "regulatory takings." *Id.* at 1015.

86.     The government "may not deny a benefit to a person on a basis that infringes his constitutionally protected interests." *Sheetz v. Cnty. of El Dorado*, 601 U.S. 267, 275 (2024) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

87.     In the Fifth Amendment land use context, this "unconstitutional conditions" doctrine prohibits the government from "requir[ing] a person to give up a constitutional right— here the right to receive just compensation when property is taken for a public use—in exchange for a discretionary benefit conferred by the government where the benefit sought has little or no relationship to the property." *Dolan v. City of Tigard*, 512 U.S. 374, 385 (1994).

88.     There must be an "essential nexus" between some "legitimate state interest" and the specific conditions exacted in exchange for the approval of a permit. *Id.* at 386.

89.     The fact that a particular property owner may have agreed to an unconstitutional condition prior to subsequent judicial precedent making it clear the condition was unconstitutional is irrelevant to the fact that the condition is, in reality, unconstitutional. *See generally City of Venice v. Neal Communities of SW FL, LLC*, No. 2017-CA-3532-NC, 2019 WL 495769 (Fla. Cir. Ct. Feb. 8, 2019).

–19–

90.     Here, the lack of jurisdictional wetlands on Plaintiff's property means there is no substantial nexus between the conditions placed on Plaintiff's permits and the Corps' legitimate interest in enforcing the CWA.

91.     Forcing a property owner "to choose between the building permit and her right under the Fifth Amendment to just compensation for the public easements" when the government has not conferred any "special benefits" in exchange constitutes an unconstitutional condition in violation of the Fifth Amendment. *Dolan*, 512 U.S. at 385.

92.     In conditioning its approval of Plaintiff's ordinary, lawful use of her private property on compliance with mitigation requirements that it lacks any statutory authority to apply to the property in question, the Corps has saddled Plaintiff with an unconstitutional burden on her right to use her property that it could not impose on her directly. The Corps has no legitimate interest in regulating land it has no jurisdiction over, and certainly no legitimate interest in requiring Plaintiff give up what is essentially a private easement over much of her property to protect jurisdictional wetlands that do not exist.

### Count IV

#### *The permits are null and void* **ab initio** *under common law contract principles*

#### **(28 U.S.C. § 1367 – Supplemental Jurisdiction)**

93.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

94.     When a contract is "technically defective, contrary to public policy, or illegal," that renders the contract "void *ab initio*." *Landcastle Acquisition Corp. v. Renasant Bank*, 57 F.4th 1203, 1223 (11th Cir. 2023) (citing *Void Contract*, Black's Law Dictionary (11th ed. 2019)).

95.     Statutory authority to enter into a specific contract is a condition precedent to the validity of a contract between an individual and the federal government. *See United States v. Miss.*

*Valley Generating Co.*, 364 U.S. 520, 563–66 (1961) (Supreme Court held federal contract void because the government agent lacked authority to enter into the agreement and contracts made in violation of statutory requirements are unenforceable); *Helton v. United States*, 532 F. Supp. 813, 819–20 (S.D. Ga. 1982) ("[I]f the officer's action, or the statutory authority for his action, is unconstitutional, such action is invalid ab initio . . . .").

96.     For the reasons articulated above at Paragraphs 63–69 the Corps' assertion of authority to regulate Plaintiff's property regardless of its jurisdictional status under the CWA directly contravenes *Sackett*'s test for federal wetlands authority and the CWA's ordinary meaning, and as a result the CWA's limited grant of jurisdiction for the Corps to regulate "navigable waters," defined as "the waters of the United States." 33 U.S.C. § 1362(7). The Corps lacks—and has always lacked—authority to require Plaintiff to mitigate and refrain from developing her non-jurisdictional property, which renders those permit restrictions invalid *ab initio*. *See Harper*, 509 U.S. at 107 (Scalia, J., concurring) ("For if it be found that the former decision is manifestly absurd or unjust, it is declared, not that such a sentence was *bad law*, but that it was *not law*.") (quoting 1 W. Blackstone, *Commentaries* 70 (1765) (emphasis in original)).

97.     Further, mutual consideration is a necessary element of contract formation, including contracts with the federal government. *N. Ala. Elec. Co-op v. Tenn. Valley Auth.*, 862 F. Supp. 2d 1291, 1299 (N.D. Ala. 2012) (quoting *Sec'y of U.S. Air Force v. Commemorative Air Force*, 585 F. 3d 895, 900 (6th Cir. 2009)).

98.     Because the Corps never had jurisdiction—and therefore the authority to prevent otherwise lawful development of Plaintiff's property—Plaintiff did not receive anything of value in consideration for the burdens she agreed to take on.

99.     Because Plaintiff did not receive anything of value that she did not already possess a complete right to when contracting with the Corps, the two permits for the main residence and guest house lacked consideration and are therefore void *ab initio*.

**Count V**

*The permits should be rescinded under equitable principles*

**(28 U.S.C. § 1367 – Supplemental Jurisdiction)**

100.    Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

101.    Even if this Court determines that the Corps' assertion of jurisdiction over Plaintiff's property is not unlawful or otherwise void, equity requires that the permits at issue be rescinded or voided.

102.    Under general contract law principles, recission by the adversely affected party to a contract is available when the contract is based on a mutual mistake "as to a basic assumption on which the contract was made . . . ." Restatement (Second) of Contracts § 152(1). *See also United States v. Fla. W. Int'l Airways, Inc.*, 853 F. Supp. 2d 1209, 1239 (S.D. Fla. 2012) (The "appropriate remedy in this situation is recission because the mutual mistake relates to a basic assumption of the Plea Agreement.").

103.    The jurisdictional nature of Plaintiff's property is the basic assumption on which the Corps required Plaintiff to agree to the permit terms in return for being allowed to build an otherwise lawful home and guest house. If not for the mistaken belief that Plaintiff's property is subject to the Corps' CWA jurisdiction, no permits would have ever been required or obtained.

104.    This mistake as to the jurisdictional nature of Plaintiff's property was mutual.

105.    The balance of equities weighs in favor of rescission, as Plaintiff currently both cannot develop her property as she would prefer and is burdened with costly mitigation

–22–

requirements, while neither the Corps nor the public at large has an interest in the regulation of property outside of the Corps' lawful jurisdiction.

## Count VI

### *Contract void for illegality*

106.     Plaintiff realleges and incorporates the allegations in the preceding paragraphs.

107.     Under longstanding principles of contract law, "where the contract grows immediately out of an illegal act, a Court of justice will not enforce it." *Armstrong v. Toler*, 24 U.S. 258, 268 (1826).

108.     As Chief Justice Marshall stated, "no principle is better settled, than that no action can be maintained on a contract, the consideration of which is either wicked in itself, or prohibited by law." *Id.* at 271–72.

109.     Even if the permits were not void *ab initio*, the contracts are illegal post-*Sackett* and thus unenforceable.

## PRAYER FOR RELIEF

For the injuries outlined above, Plaintiff respectfully requests that this Court enter judgment in her favor and provide the following relief:

1.  Declare the Corps' assertion over Plaintiff's non-jurisdictional property is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

2.  Declare the Corps' assertion over Plaintiff's non-jurisdictional property is an *ultra vires* act in excess of its statutory authority, or otherwise illegal;

3.  Set aside the Corps' assertion of jurisdiction over Plaintiff's non-jurisdictional property as unlawful pursuant to Section 706 of the APA;

4. Permanently enjoin Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them from enforcing against Plaintiff the terms of any permit premised on a theory of CWA jurisdiction incompatible with the meaning of the statute, as explained by the U.S. Supreme Court in *Sackett v. EPA*, 598 U.S. 651 (2023);

5. Award Plaintiff nominal money damages in compensation for the violation of her Fifth Amendment rights;

6. In the alternative, rescind the permits under equitable principles as contracts entered into in violation of the Corps' statutory authority and under a mutual mixed mistake of fact and law;

7. Award Plaintiff reasonable attorney fees and costs, pursuant to 28 U.S.C. § 2412, 42 U.S.C. § 1988, or any other appropriate authority; and

8. Order such additional relief as justice may require.

DATED: July 7, 2025.

Respectfully submitted,

David C. McDonald*                           */s/ Mark Miller*_____
Frank D. Garrison*                           Mark Miller
PACIFIC LEGAL FOUNDATION                      Fla. Bar No. 0094961
3100 Clarendon Blvd., Ste. 1000              PACIFIC LEGAL FOUNDATION
Arlington, VA 22201                          4440 PGA Blvd., Ste. 307
Ph: (202) 888-6881                           Palm Beach Gardens, FL 33410
Email: dmcdonald@pacificlegal.org            Ph: (561) 691-5000
        fgarrison@pacificlegal.org           Email: mark@pacificlegal.org
*pro hac vice pending*

*Attorneys for Plaintiff Sedigheh Zolfaghari*